DECISION
Defendant-appellant, Henry E. Solomon, Jr., appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of two counts of kidnapping in violation of R.C. 2905.01, one accompanied by a finding that defendant released the victim in a safe place unharmed. Defendant assigns a single error:
 THE EVIDENCE ESTABLISHED AS A MATTER OF LAW THAT APPELLANT WAS NOT GUILTY BY REASON OF INSANITY. THE JURY'S GUILTY VERDICTS ARE NOT SUPPORTED BY THE EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Because the jury's verdict is supported by sufficient evidence and is not against the manifest weight of the evidence, we affirm.
Brenda Bradford met defendant in 1995 in Georgia, and began dating defendant in early 1997. While she was aware that defendant had served in Vietnam, that fact did not cause any problems in their early relationship. Defendant did not speak about it much at first, but as he grew into the relationship with Bradford he became "a little more emotional" about it. (Tr. 35.) Bradford noted defendant had a pronounced startle effect, and would tell her about nightmares he had growing out of the incident he experienced on the Forrestal during the Vietnam War. In 1998, defendant moved to Ohio, and in August 1998, Bradford also moved to Ohio. They were married on August 15, 1998, and resided at an apartment in Reynoldsburg.
Once they were married, the relationship deteriorated. Convinced Bradford was seeing someone else, defendant on Sunday, June 27, 1999, asked her to give him $1,000; defendant said he would get an apartment, and the marriage would be over. Bradford complied. Defendant, however, did not go to work the following Monday, which caused Bradford concern. By looking through her checking account at the bank where she worked, she was able to determine he was in Missouri. On Friday morning, he called her, requesting to come home. Bradford refused. Nonetheless, one day he called Bradford at work to tell her he was in their apartment getting his things. Defendant's actions scared Bradford, who reported the incident to the police for documentation.
Afraid of defendant, Bradford had asked her son to change the locks on the apartment. Her son called her on Sunday, July 25 to say he would be coming on Monday to change them. Bradford heard someone at the door as she was getting ready for work Monday morning. When she opened the door, defendant had his hand on her son's arm and was pointing what looked like a gun at him. Defendant took Bradford's son inside the apartment, put the gun to the side of Bradford's head and said "[s]hut up." (Tr. 54.)
Defendant told her to call her work place to let them know she would not be in that day. Defendant then taped the wrists of Bradford's son behind his back and kept saying he just wanted some answers. He invited them all to sit down, and he began to tell Bradford's son that his mother was a liar. He mentioned she was dating someone, noted the relationship between defendant and her had deteriorated, and told Bradford's son "[y]ou got one hard-hearted mom here." (Tr. 58.)
Although defendant had displayed anger, some of it began to dissipate. At one point, defendant turned to Bradford's son and said "Doug, I never meant for you to get involved in this. *** You were like a son to me. *** I didn't expect you to be here and I never meant for you to be involved." (Tr. 61.) He let Bradford's son leave. Within five minutes after Bradford's son left, defendant said "I am in big trouble here. I am going to go to jail. And I'm sure the police are out there and I am going to go to jail." (Tr. 63.)
Bradford was not free to go, and defendant took her into the bathroom. He locked them in, and had her draw a bathtub of hot water. She suggested he throw the gun away, which he did. They sat in the bathtub, but defendant had a knife in his hand. Although he said the water was making him relaxed, he stated, "I can't believe this is happening. I'm in so much trouble." Defendant eventually dried off and both he and Bradford left the bathroom.
Bradford's son had called earlier, and after about six hours he called again. Bradford told her son and the officers with him that she did not feel personally threatened, but felt any threat from defendant was more self-directed than at hurting her. They asked to speak to him, and she handed the phone to defendant. When he got off the phone, he said, "[y]ou need to go out there. They're waiting for you." (Tr. 71.) He escorted her to the door, and she remembered watching defendant go back toward the back of the apartment where the bathroom was.
When the police entered, they found defendant in the bathroom with a knife in his right hand, holding it to the left side of his throat. He was kneeling in the bathtub, facing the bathroom door. A big pool of blood was beside the bathtub and in the bathtub itself the water was red, mixed with blood. Defendant appeared to have slit both wrists.
By indictment filed August 5, 1999, defendant was charged with two counts of kidnapping, with specifications under R.C. 2941.141 and 2941.145. Although he initially entered a not guilty plea to the charges, he later added a not guilty by reason of insanity plea. The court ordered an evaluation under R.C. 2945.371 to ascertain if there was any basis for defendant's plea. Defendant ultimately was evaluated by Bradley A. Hedges, Ph.D., a psychologist, who testified on behalf of the state, and James P. Reardon, Ph.D., who testified on behalf of defendant.
At the close of the state's case, the trial court granted a Crim.R. 29 motion regarding the specifications. Following a jury's guilty verdicts on the two counts of kidnapping, one involving release of the victim at a safe place unharmed, the trial court found defendant guilty and sentenced him accordingly.
In his single assignment of error, defendant contends that given the testimony of Dr. Reardon, the verdict is not supported by sufficient evidence and is against the manifest weight of the evidence. To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported.
When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins
(1997), 78 Ohio St.3d 380 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence"). Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230.
Pursuant to R.C. 2901.01(A)(14):
 A person is "not guilty by reason of insanity" relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.
Defendant bears the burden of proof by a preponderance of the evidence to show he is not guilty by reason of insanity.
Here, both doctors evaluated defendant, and while they agreed in some respects, they came to opposite conclusions. Both agreed defendant suffered from Post Traumatic Stress Disorder arising from the Vietnam War experience described at trial, but Dr. Hedges found defendant had a borderline personality disorder. Dr. Reardon instead diagnosed a major depressive disorder. They reached opposite ultimate conclusions: Dr. Hedges concluded defendant knew the wrongfulness of his acts on the date of the incident, and Dr. Reardon concluded he did not.
Neither testimony is facially deficient. Each witness described his respective evaluation of defendant and the process used to reach his ultimate conclusion. Each explained the reasons for his conclusion, the facts brought out at trial in support of that conclusion, and the reasons the other expert's rationale was unpersuasive. The jury, in essence, was asked to determine which expert was more credible, a matter well within the province of the jury.
If the expert evidence is construed in the state's favor, the testimony of Dr. Hedges supports a conclusion that defendant was not guilty by reason of insanity at the time of the offense. Moreover, even in weighing the evidence the jury, within its province, could determine Dr. Hedges to be the more credible witness. The jury apparently did so, and Dr. Reardon's testimony does not render that verdict against the manifest weight of the evidence.
In the final analysis, although both experts agreed defendant suffered from Post Traumatic Stress Disorder, they disagreed on the ultimate issue: whether defendant was able to appreciate the wrongfulness of his acts on the date at issue. While Dr. Reardon said he did not, Dr. Hedges said he did. The jury chose to believe the testimony of Dr. Hedges, and his testimony, if believed, supports the jury's verdict. Accordingly, defendant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
BOWMAN and BROWN, JJ., concur.